Homes Beautiful Inc. v. Commissioner. Henry H. Dalton, Trustee under indenture of trust made on December 24, 1941, between Albert Gersten, Lucille Gersten and Theodore Robbins, Grantors, and Henry H. Dalton, Trustee v. Commissioner.
Homes Beautiful Inc. v. Commissioner
Docket Nos. 5861, 6116.
United States Tax Court
1947 Tax Ct. Memo LEXIS 172; 6 T.C.M. (CCH) 683; T.C.M. (RIA) 47166; June 24, 1947
Jacob Shearer, Esq., for the petitioners. W. J. MacFarland, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: Respondent determined deficiencies as follows: Declared Value
Excess
Docket No.
Year
Income Tax
Excess Profits
Profits
5861
Fiscal - 3/31/41
$15,995.07
$7,126.27
$13,675.29
Fiscal Period 4/1/41 to 12/31/41
28,413.99
Fiscal - 3/31/42
14,123.56
6,689.48
6116
1942
3,503.79
6,451.44
26,168.20
1943
2,467.59
5,849.58
26,060.24
The questions are (1) what was the value of second trust deed notes when received by petitioners? The answer to *173 this question will determine to what extent petitioners realized income on receiving such notes and from subsequent collections thereon and will also determine whether or in what amount petitioner, Homes Beautiful, is entitled to a net operating loss deduction for the year ending March 31, 1940. (2) Did the respondent correctly disallow a loss of $8,240 for the year ending March 31, 1942, claimed by petitioner, Homes Beautiful, on account of the sale of certain real estate to certain of its stockholders? (3) Was the trust involved in Docket No. 6116 an association taxable as a corporation for the calendar years 1942 and 1943? A question concerning borrowed invested capital has been stipulated and a question concerning declared value excessprofits tax has been conceded by respondent. The cases were consolidated at the hearing. Returns were filed with the collector of internal revenue for the sixth district of California. The facts as stipulated are adopted and incorporated herein by reference. Findings of Fact Valuation Issue. Petitioner, Homes Beautiful, Inc., hereinafter referred to as the Company, was incorporated under California law March 30, 1939. On or about December 29, 1941, pursuant *174 to resolution, the Company dissolved and transferred its assets to petitioner, Dalton, as trustee for the benefit of the former stockholders of the Company, Lucille and Albert Gersten, being husband and wife, and Theodore Robbins. The Company engaged in the business of buying, developing and selling real estate. The development was the building of low cost homes. For this purpose the Company bought three tracts of land known as Hillside, Lynwood and Compton, all in the Los Angeles area. Hillside was wholly undeveloped when bought but Lynwood and Compton were improved with streets and utilities. The Company in most instances borrowed the money to buy the land and build the homes from Coast Federal Savings & Loan Association of Los Angeles, hereinafter referred to as the Loan Company. Separate loans were made for each house and lot as a unit. Each loan was evidenced by the Company's note secured by a first deed of trust in favor of the Loan Company. Generally, the notes relating to the Lynwood and Compton lots ran for 15 years and those relating to Hillside ran 20 years. The notes called for monthly payments of principal and interest in an amount approximately equivalent to one per *175 cent or less than one per cent of the original principal. Interest was at the rate of 6 1/2 per cent. The proceeds of each loan were not paid to the Company immediately upon execution of the note and deed of trust but were held by the Loan Company in a special building account pursuant to a Building Loan agreement, which in each case was executed by the Company and the Loan Company. The proceeds of the loan were thereupon paid to the Company in five or six installments upon completion of various stages of construction, the last installment being generally paid after completion of construction and after the period for the filing of mechanics' liens by material men and laborers had expired. Such payments were made to the Company in all cases irrespective of whether or not the subject property had in the meantime been sold and title transferred by the Company to a purchaser. Each purchaser of a lot assumed the Company's liability on the first deed of trust note to the Loan Company and the Company was wholly relieved of its obligation to the Loan Company. Generally, each purchaser also made a small cash down payment to the Company and gave a note for the remaining balance due secured *176 by a second trust deed in favor of the Company. The value of these second trust deed notes when received by the Company or the trust is one of the principal questions of the case. In some few instances the purchaser paid to the Company in cash the entire difference between the sales price and the note in favor of the Loan Company. In these instances no second trust deeds were executed. In some few instances the down payment was partly in cash and partly by note. The second trust deed notes relating to Lynwood and Compton ran 15 years and those relating to Hillside ran 20 years, just as did the first trust deed notes. All these notes called for small monthly payments of less than one per cent of the principal amount of the note, which payments applied, first, to interest and then to principal. Each purchaser's credit was investigated by Dun & Bradstreet. Each purchaser was required to fill out a questionnaire furnished by the Company cliciting information concerning their income, solvency and dependents. The Loan Company had to approve each purchaser before a sale was made. The average income of the purchasers was from $125 to $150 a month. The typical purchaser had a wife and two *177 children. Individual monthly payments covering the first and second trust deed notes averaged about $35. The following schedule shows by lot and tract number the original sales, repossessions and resales made by the Company and the trustee: Schedule of Sales by Homes Beautiful
Year ending 3-31-40
Repossessed
Resold
Tract
Original Sale - Lot No.
Lot No.
Lot No.
Lynwood -
#3335
1300, 1308
1300
#6575
5, 15
#7572
160, 149, 168, 194
#8716
150 to 153, 156, 159, 160, 162 to
166.
#9288
13, 21, 12-4, 14-4 to 18-4, 23-5,
24-5, 26-5.
#7816
33-34, 24-25, 28-29, 12-3, 13-3,
23/24-3, 23/24-7
23/24-3, 26/27-3, 19/20-7 to
33/34-7
35/36-7, 21/22-11.
#9862
6, 23 to 29
27, 28
Compton -
#7115
1-4, 2-4, 3-4, 4-4, 11-4, 12-4, 1-5,
15-5
9-5, 12-5, 13-5, 14-5, 15-5, 15-1,
13-2
17-1, 21-1, 22-1, 23-1, 25-1, 27-1,
14-2
1-2, 2-2, 6-2, 9-2, 12-2, 13-2
14-2, 21-2, 22-2, 1-3, 3-3, 10-3,
12-3, 13-3, 16-3, 17-3, 18-3,
Year ending 3-31-41
Hillside -
#12323
1 to 8, 14 to 123
2, 26, 45, 61, 65,
68, 89, 91, 99, 107
68, 88, 89, 91,
99, 107
#12524
1 to 24, 26 to 31
11
#111917
1
Lynwood -
#8716
158-A
#9288
20-5
#7816
31/32-11
#9862
27
#12259
1 to 9
Compton -
#7115
3-1, 4-1, 6-1, 7-1, 10-1, 11-1, 14-1,
11-3
20-1, 5-4, 6-4, 13-4, 29-4, 5-5,
3-2, 11-2, 16-2, 20-2, 25-2, 2-5,
5-3 to 9-3, 11-3, 15-3, 20-3, 24-3,
25-3, 26-3, 28-3
#6785
6/15-B, 7/14-B, 8/13-B, 9/12-B,
33-B, 13-C, 14-C, 8-G, 21-P
#8678
11-1, 12-1, 20-2
#9910
75
Year ending 3-31-42
Hillside -
#12323
9, 10, 13
67, 67 **
2, 26, 45, 61, 65, 67,
67 **, 88
#12524
25, 31 to 34
11 *
#11564
1 to 101, * 103, 106, 107, 111
9, 33, 76
9, 33, 76
#6837
5, 6, 10 to 12, 17, 18
Lynwood -
#3335
1300
#7816
23/24-7, 33/34-7
Compton -
#7115
13-2, 14-2, 15-5
*178 Schedule of Sales by Dalton, Trustee
Trust - Calendar Year 1942
Hillside -
#11564
87, * 88, * 91,* 102, 104, 105, 108,
56
56
109, 110, 112, 113, 114, 115 *
#12323
11-12 *
Lynwood -
#9862
28
#7816
23/24-3 *
1943
Compton -
#7115
11-3
The following schedule summarizes the number of sales, repossessions and resales: 3-31-40
SALES
REPOSSESSIONS
RESALES
Hill-
Lyn-
Comp-
Hill-
Lyn-
Comp-
Hill-
Lyn-
Comp-
side
wood
ton
Total
side
wood
ton
Total
side
wood
ton
Total
64
36
100
6
3
9
3-31-41
149
12
44
205
12
1
13
5
1
6
3-31-42
120
120
5
5
12
3
3
18
Trust - Calendar Year 1942
14
14
1
1
1
2
3
Trust - Calendar Year 1943
1
1
283
76
80
439
18
6
4
28
18
6
4
28
*179 It is not practicable to give for each lot detailed statistics concerning cost, sales price, face amount of first and second deeds of trust and the down payments. This information can be obtained by correlating the schedule given above showing sales, repossessions and resales by tract and lot number with Exhibit 9-1 and Exhibit 20-T, which are the subject of stipulation. The following schedule, however, presents with sufficient accuracy for present purposes the generalized relationship between down payments, the face amounts of the first and second deeds of trust notes, the sales price and cost for the period of the Company's operation and the period of the trustee's operation: Period of Company's Operation
2d Trust
1st Trust
Cash
Notes
Notes
Sales Price
Cost
Hillside
$ 77,566.79
$195,910.53
$ 970,610.52 =
$1,244,087.84
$ 864,839.44
Lynwood
12,395.00
46,811.78
185,444.22 =
244,651.00
170,671.41
Compton
11,400.00
51,114.95
226,694.05 =
* 289,209.00
210,163.05
$101,361.79
$293,837.26
$1,382,748.79 =
$1,777,947.84
$1,245,673.88
Period of Trustee's Operation
Hillside
$ 8,126.16
$ 9,482.05
$ 46,621.73 =
$ 64,229.94
$ 34,935.87
Lynwood
400.00
600.63
2,599.37 =
3,600.00
3,178.79
Compton
1,111.86
887.69
2,262.31 =
4,261.86
3,642.04
$ 9,638.02
$ 10,970.37
$ 51,483.41 =
$ 72,091.80
$ 41,756.70
*180 In several instances security salesmen called on Gersten to inquire if the Company would sell any trust deed notes. In 1941 one Stern offered the Company 20 per cent to 25 per cent of the unpaid balance of principal due on such notes if he, Stern, could select the specific notes to be purchased. Stern's offer was for an option to buy which would enable Stern to arrange a resale before actually buying the notes from the Company. The Company did not accept this or any other offer and did not itself offer any notes for sale. During the last three months of 1942 Gersten individually bought 25 selected second trust deed notes relating to Lynwood and Compton from the trustee for approximately 50 per cent of the unpaid balance of principal then due thereon. These notes were refinanced at the rate of approximately 70 per cent of the unpaid balance of the principal due early in 1943. Some time in 1943 Gersten bought the interest that Robbins owned in the trust. The sales price was based on a valuation of the second trust deed notes at about 35 per cent of the unpaid principal balance due thereon. Robbins was paid one-half of such value or approximately 17 1/2 per cent of the unpaid principal *181 balance due on the notes. Some of the second trust deed notes in which Gersten acquired an interest in December 1941, when the Company dissolved, were sold three or four years later at their then face value. During the period of the Company's activities there were several hundred projects under construction in the Los Angeles area of a type similar to that conducted by the Company. Forty or fifty builders accounted for about 90 per cent of this construction. The real estate market in Los Angeles was a rising one prior to and during the period concerned here. Of the 439 original lots sold by the Company and the Trust only 18 were repossessed. The Company and the trustee for Federal tax purposes treated the second trust deed notes as having no value when received. In the deficiency determination respondent treated the notes as worth their face value when received. Respondent now contends that the second trust deed notes received by the Company were worth 65 per cent of their face value and that those received by the trust were worth 80 per cent of their face value. The second trust deed notes received by the Company were worth 35 per cent of their face value and those received *182 by the trust were worth 50 per cent of their face value. Opinion Valuation Issue. In considering the problem of evaluating the second trust deed notes no attempt has been made to differentiate between Hillside, Lynwood or Compton. Nor has any distribution been attempted between original notes and those received on resales. The only differentiation attempted is one of time between the period of the Company's operation and that of the trustee. This has been the approach of the parties in general and appears to us to be the only practicable one. On this basis the petitioners contend that the second trust deed notes had no value when received by the Company or the trustee. Respondent, on the other hand, originally determined that the notes were worth their face value when received but now contends that the notes received by the Company were worth 65 per cent of their face amount and those received by the trustee were worth 80 per cent of face. Petitioners rely to a large extent on the expert testimony of their witnesses Noble and Schmutz. Noble testified that in his opinion the second trust deed notes had no value when received by the Company or the trustee. Schmutz testified that *183 in his opinion the second trust deed notes were worth from 1 cent to 5 cents when received by the Company and when received by the trustee. Petitioners' witnesses and petitioners themselves rely to a large extent on the fact that there was little or no equity underlying the second trust deed notes. Petitioners also stress that these notes were long-term, were relatively unseasoned during the years here involved, and hence were of a highly speculative character. Respondent relies on his witness Simpson, who testified that in his opinion the second trust deed notes were worth 65 per cent of their face value when received by the Company and were worth 80 per cent of their face value when received by the trustee. Respondent and his witness emphasize that during the years in question the real estate market was strong and that there was a good demand for the type of housing furnished by petitioners. The fact that there were few repossessions supports this view. The monthly payments required of the purchasers were small and the purchasers' credit was investigated. These elements tend to counterbalance the lack of equity which petitioners stress. In addition to the opinions of the parties' *184 witnesses we have the benefit of certain transactions. Stern, in 1941, offered to purchase certain selected notes for from 20 per cent to 25 per cent of their face value. Gersten late in 1942 purchased some notes for 50 per cent of their face value and had them refinanced early in 1943 for 70 per cent of their face value. In 1943 Gersten purchased some notes for 35 per cent of their face value. Gersten sold the notes which he had received from dissolution for their face value three or four years after he had acquired them. The Company never offered the notes for sale. After having carefully considered the expert testimony and the reasons underlying the opinions offered and after having considered the actual transactions with respect to the second trust deed notes, we have concluded and have found as a fact that the notes were worth 35 per cent of their face value when received by the Company and were worth 50 per cent of their face value when received by the trust. In applying the values determined here to the notes received by the Company and the trustee, proper adjustment should be made on recomputation on account of the notes paid for lots which were later repossessed. The values *185 as here determined will control the amounts realized as income on collections on the notes and will also control the net operating loss question. Findings of Fact Loss Issue. In the latter part of 1941 it was resolved by the Company to sell a designated portion of real estate consisting of about 20 acres for $10,000 to Milton Gersten, the brother of Albert Gersten, and charge therefor the accounts of Albert Gersten and Robbins, $5,000 each. Pursuant to this resolution the Company transferred to Milton as nominee the real estate in question on October 30, 1941, and the accounts of Albert Gersten and Robbins were charged accordingly. The Company had purchased the land so transferred as part of a larger tract on April 19, 1940. The charges to the accounts of Gersten and Robbins were transferred by the Company to the trustee as accounts receivable. Trustee's accounts show a credit of $5,000 to the accounts of Robbins but Albert Gersten was still indebted for his share at the time of the stipulation of facts. Robbins owned 50 per cent and Albert and Lucille Gersten each owned 25 per cent of the Company's stock at the time of this transfer. The land transferred was subsequently subdivided, *186 improved and sold at a profit. In its income and declared value excess-profits tax return, Form 1120, for the period beginning April 1, 1941 and ending December 31, 1941, the Company reported as a loss from the sale of property the amount of $8,240 on account of the above described transfer. Schedule D of this return reports the cost of the land as $18,240 and the sales price as $10,000. Under a heading "Supplemental Information Required for Schedule C and D" the Company stated that more than 50 per cent of its stock was owned by the purchaser of the land involved and that the land had been purchased jointly by Robbins, owning 50 per cent of the common stock, and Albert Gersten owning 25 per cent. Respondent disallowed the amount of the claimed loss. Opinion Respondent contends that the transfer of the land by the Company to Milton Gersten lacks substance and that the alleged loss arising therefrom should not be given recognition for tax purposes. Alternatively, respondent contends that Albert Gersten and Robbins were partners in the purchase and that they owned more than 50 per cent of the Company's stock and that therefore the loss can not be deducted by virtue of section *187 24 (b)(1)(B) and section 24 (b)(2)(C) of the Internal Revenue Code. [1] We agree with respondent's alternative argument and will not, therefore, consider whether the transfer lacks substance. If Albert Gersten and Robbins were partners in the purchase of the land in question then by virtue of section *188 24 (b)(2)(C), supra, each of them would be deemed to have owned the stock owned by the other and, in this case, would have been deemed to have owned at least 75 per cent of the stock. If Lucille Gersten's stock be attributed to Albert, then each partner would be deemed to own 100 per cent of the stock. Since each would be deemed to own more than 50 per cent then by virtue of section 24 (b)(1)(B), supra, no deduction would be allowable. Petitioner, Homes Beautiful, contends that there is nothing in the record to indicate that Albert Gersten and Robbins were partners or were anything more than copurchasers. We not only disagree with petitioner's conclusion as to the record but further consider that petitioner misconceives its position. Respondent has disallowed the loss in question. It is up to petitioner to establish the necessary facts to sustain a deduction. There is more than an inference in the record that Gersten and Robbins were partners. They bought the land in question together, each assuming liability for one-half of the purchase price. Since this purchase was made shortly before the Company handed over its assets to the trustee a reason for the purchase is suggested. Since *189 the land in question required development and since the trust was primarily for liquidation purposes it was necessary to put the property in question in other hands. Otherwise the Company would have had to develop the land and thereby delay the establishment of the trust or the trust would have had to develop it and run the risk of being considered an association. The land was in fact developed and sold for a profit after its acquisition by Gersten and Robbins. It appears that Gersten was largely responsible for its development and sale but since Robbins was a co-owner we can not suppose he did not share in the profits. It seems apparent to us from these circumstances that Gersten and Robbins purchased the land with the intention of having it developed and sold for a profit which they would share. On this state of the record we do not consider that petitioner can convincingly answer respondent's contention by claiming there is no indication in the record that Gersten and Robbins were partners. We therefore must sustain respondent. It follows that no loss is deductible on account of the transfer in question. Findings of Fact Trust Issue. Pursuant to the stockholders' authorization *190 and instructions and after compliance with state requirements the Company transferred its assets and liabilities on or about December 29, 1941, to Henry H. Dalton, as trustee. The Company's balance sheet at the time of such transfer showed assets worth $77,638.37, not including notes receivable in the unpaid principal amount of $244,411.05. Liabilities were shown in the amount of $64,289.52. Excess of assets over liabilities was shown as $13,348.85. Dalton had been constituted as trustee of a trust established by Lucille and Albert Gersten and Robbins as grantors for their own benefit on or about December 24, 1941. The indenture states the trust purpose as follows: "* * * This trust is established for the sole purpose of holding the assets transferred to it by grantors, collecting the income thereon, distributing same to beneficiaries and other activities specified herein and necessary to the orderly liquidation of said assets. Under no circumstances shall this trust or the trustee thereof have power to engage in any trade or business, nor in any other activity except as necessary to the liquidation of said assets. Grantors hereby declare that this trust is established by them *191 as distributees in dissolution of the corporation for their own convenience in holding and liquidating said assets." The trustee is directed to collect amounts due the trust, pay necessary expenses and distribute the remaining proceeds to the beneficiaries monthly. The trustee is authorized to retain $500 a month as a revolving fund to meet current administrative expenses. The trustee was given powers consistent with his duties of collecting amounts due the trust, but it was "* * * provided, however, that a majority in interest of the beneficiaries of this trust shall have the right at any time to direct in writing that the trustee perform any acts not inconsistent with the powers of the trustee and purposes of the trust hereinbefore specified or refrain from doing any act, whether within or without the trustee's powers; it being the express intention of the grantors that the trustee shall have the powers, rights and duties hereinbefore specified, but that the exercise thereof shall be subject to the direction in writing of a majority in interest of the beneficiaries if they choose to avail themselves of that right; provided further that the control so granted to the beneficiaries *192 shall extend only over management of the trust properties, and shall not apply to any matters involving the distribution of income or principal of the trust. * * *" It was provided: "At any time any beneficiary may make a written request that either one of the Gersten grantors, together with grantor Robbins, be appointed to manage the liquidation of the trust assets. In such event, said individuals shall operate as co-managers; shall receive the same amount of compensation to be mutually agreed upon. No one beneficiary shall be permitted at any time to act as such manager without first obtaining the written consent of the other two beneficiaries." With respect to termination, the indenture provided: "This trust may be terminated by any beneficiary hereof upon not less than sixty (60) days' written notice to the trustee and the other beneficiaries. It shall terminate upon the distribution by the trustee of all of the principal and income as provided in paragraphs II and III. "This trust shall in any event terminate upon the death of the last surviving beneficiary named herein." It was further provided that the trustee after three years from the trust's creation had the right, *193 if he so elected, to distribute all the assets remaining in the trust. If a beneficiary died during the term of the trust "his or her distributions shall be made to the representative of his estate and such representative shall have the power to act in the place and stead of such deceased beneficiary." The activities of the trustee in administering the trust consisted in part of collecting the installment payments payable under the notes secured by the second deeds of trust and of distributing the proceeds to the beneficiaries. The trustee made these collections by placing all the notes in his possession in the hands of the Loan Company for collection. Upon collection, the Loan Company, after deducting its collection charges, thereupon placed the net proceeds collected in a savings-share account issued by it to the trustee. There was also transferred to the trustee 14 lots on which houses had been constructed. These houses were sold during the course of the administration of the trust. Albert Gersten supervised the making of these sales but the trustee signed the necessary deeds and other instruments, and the notes given in payment of the balance of the sale price and secured by *194 second deeds of trust were made payable to the trustee. There was also transferred to the trustee 5 vacant lots consisting of lots 11 and 12 of tract 12323 and lot 35 of tract 12524 and lots 23 and 24, block 3 of tract 7816. The trustee on March 16, 1942, transferred lots 11 and 12 of tract 12323 to Albert Gersten for the sum of $1,600, which was paid in cash. This transaction was not negotiated by the trustee, however, but between Albert Gersten and Robbins. Lots 23 and 24 in block 3 of tract 7816 were sold by the trustee on May 16, 1942, for the sum of $845, paid in cash. This sale was negotiated by Albert Gersten. During the course of the administration of the trust, the trustee acquired some of the houses previously sold by the Company and the trustee caused sales of these repossessed parcels to be made. During the calendar year 1942 the trustee distributed $27,243.27 to Robbins and $13,621.63 each to Albert and Lucille Gersten, or a total of $54,486.53. During 1943 the trustee distributed to Robbins $1,762.50 and $48,093.75 each to Albert and Lucille Gersten, or a total of $97,950. The trust was amended from time to time to reflect the sales by Robbins to the Gerstens of *195 various percentages of Robbins' interest in the trust. For the calendar years 1942 and 1943, the trustee filed fiduciary income tax returns taking as deductions the amounts claimed as distributed [2] to the beneficiaries. Respondent disallowed these deductions on the theory that the trust was an association taxable as a corporation. Opinion Respondent contends that the trust is an association taxable as a corporation because the beneficiaries were associates, the trust was intended to carry on a business for profit and resembled in organization a corporation. Petitioner-trustee denies this contention and argues that the trust was not engaged in carrying on a business but was merely conserving and liquidating the assets held by it. We agree with petitioner that the trust was, for tax purposes, a trust and not an association taxable as a corporation. The trust involved here impresses us as one which is consistent in purpose and character with traditional trust concepts as distinguished from one which is a mere hybrid corporation *196 in purpose and operation. The trust indenture clearly states the purpose of the trust. It was established to hold and liquidate assets, collect income and proceeds, and distribute and make distributions to the beneficiaries. The trustee is specifically enjoined from engaging in any business or other activity except as necessary to liquidation. The trustee was only authorized to retain a revolving fund of $500. In actual operation the trustee's role was a relatively passive one. The collection of the installment payments was his principal function and this was turned over to the Loan Company. It is true that 14 houses and 5 lots were sold but these sales were supervised by Gersten and Robbins and, in any event, represent an insignificant part of the trust function in terms of income production. Essentially it seems to us the period of business activity had as a practical matter terminated by the time the trust was created. Generally speaking, all that was left was the second trust deed notes. These could have been distributed in dissolution to the stockholders individually. This would have involved, however, the complications, among others, of allocation. The conserving and liquidating *197 of such securities strikes us as a function peculiarly appropriate for a trust medium. There was no business activity left to be done and hence no need for a continuation of the corporate form or a variation of it. The avowed purpose of the trust, the circumstances surrounding its creation and its operation all connote to us a classic trust situation as distinguished from a corporate business masquerading in trust habiliments. To find here an association would be, in our opinion, to insist on a continuation of the corporate form for tax purposes, even though the situation and the parties concerned no longer required or wanted one. For these reasons and having considered all the other features and aspects of the situation, we have concluded and hold that the trust was not an association taxable as a corporation. Decision will be entered under Rule 50. Footnotes
**. Repossessed and resold twice.↩
*. Lots 87 to 95 and 97 to 100 of Tract #11564 were F.H.A. financed and carried no second trust. Lot 96 carried no second trust but was not F.H.A. financed. Lot 11 of Tract #12524 carried no second trust. ↩
*. Not subject to second trust deeds.↩
*. This amount is not reduced by some $3,000 odd on account of cancellation.↩
1. SEC. 24. ITEMS NOT DEDUCTIBLE. * * *
(b) Losses from Sales or Exchanges of Property. - (1) Losses Disallowed. In computing net income no deduction shall in any case be allowed in respect of losses from sales or exchanges of property, directly or indirectly - * * *
(B) Except in the case of distributions in liquidation, between an individual and a corporation more than 50 per centum in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual; * * *
(2) Stock Ownership, Family, and Partnership Rule. - For the purposes of determining in applying paragraph (1), the ownership of stock - * * *
(C) An individual owning (otherwise than by the application of subparagraph (B)) any stock in a corporation shall be considered as owning the stock owned, directly or indirectly, by or for his partner.↩
2. The amount shown as distributed to the beneficiaries on the 1943 return is $94,788.85 but the stipulation increases this amount to $97,950.↩